FILED

2014 Sep-10  PM 02:00
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **STAR DISCOUNT PHARMACY, INC., et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action Number |
| | ) | **5:11-cv-02206-AKK** |
| **v.** | ) | |
| | ) | |
| **MEDIMPACT HEALTHCARE SYSTEMS, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs Star Discount Pharmacy, Inc., Propst Discount Drugs, Inc., C & H Pharmacy, Inc., and Darden Heritage pursue this claim against MedImpact Healthcare Systems, Inc., Michael Struhs, and Nicole Adams for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, violation of Alabama's antitrust laws, Ala. Code. §§ 6-5-60 and 8-10-1, *et seq*., and negligence, wantonness, unjust enrichment, and intentional interference with a business relationship, pursuant to Alabama common law. The defendants move for summary judgment on all of the plaintiffs' claims, doc. 113, and the motion is fully briefed and ripe for review, docs. 115, 123, and 125. Additionally, the defendants move to strike the plaintiffs' supplemental evidentiary submissions, doc. 130, and that motion is

fully briefed as well, docs. 132 and 133. Based on a review of the evidence and the law, the court finds that the plaintiffs have failed to present sufficient evidence to support their RICO, antitrust, and unjust enrichment claims and, consequently, the defendants' motion for summary judgment on those claims is due to be granted. Because the plaintiffs' remaining negligence, wantonness, and intentional interference with a business relationship claims are governed by Alabama law, the court will remand those claims to the Circuit Court of Madison County, Alabama.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II. FACTUAL ALLEGATIONS

The following is an account of the facts necessary to resolve the present matter viewed in a light most favorable to the plaintiffs.[1] Alabama's Public Education Employees' Health Insurance Plan ("PEEHIP") provides health insurance benefits to the state's public educators. Doc. 1-1 at 3. In early 2010, "defendant MedImpact[2] entered into an agreement to serve as the third party administrator . . . of PEEHIP's prescription medication program." *Id.* Subsequently, MedImpact "began directly contacting pharmacies and requesting that the pharmacies enter into specific contracts [for reimbursement] with MedImpact." *Id.* at 4. Many Alabama pharmacy networks, ranging from major chains to independent associations, agreed to the terms of these contracts by August 2010. Doc. 152-6 *SEALED* at 65–80. MedImpact assumed the duties of administering the PEEHIP network on October 1, 2010. Doc. 129-5 *SEALED* at 109.

The plaintiffs in this lawsuit are Darden Heritage and the pharmacies he owns and operates in Madison County, Alabama. Doc. 1-1 at 2. In the fall of 2010, MedImpact extended contract terms to the plaintiffs' pharmacy association, American

---

[1] As explained above, a "court shall grant summary judgment if the movant shows that there is not genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

[2] Defendants Struhs and Adams are employees of MedImpact. Doc. 1-1 at 3.

Pharmacy Network Solutions ("APNS"), which APNS declined. Doc. 152-6 *SEALED* at 81–85. MedImpact and APNS ultimately reached a temporary agreement that allowed APNS pharmacies, including the plaintiffs' pharmacies, to continue servicing PEEHIP beneficiaries until January 1, 2011. *Id.* at 93. MedImpact and APNS were unable to reach a long-term agreement during their 2010 negotiations, *id.* at 96, and on December 7, 2010, the PEEHIP Board voted to remove APNS from its retail pharmacy network, effective January 1, 2011, doc. 129-75 *SEALED* at 1–2. In December 2010, anticipating the January 1, 2011 cutoff, MedImpact sent a letter to the plaintiffs' patients explaining that all Alabama pharmacies except those affiliated with APNS agreed to MedImpact's reimbursement rates and that the rates demanded by APNS were approximately twenty-five percent more expensive to PEEHIP than those demanded by other pharmacy networks. The letter directed the patients to nearby pharmacies in the PEEHIP network. *Id.*

After the 2010 negotiations between MedImpact and APNS failed, many APNS member pharmacies contracted directly with MedImpact to continue serving PEEHIP beneficiaries. *See, e.g.*, doc. 152-11 *SEALED* at 1–9. On December 28, 2010, MedImpact extended contract terms to Heritage, who rejected them. Doc. 152-4 *SEALED* at 122. MedImpact again extended contract terms to Heritage on February 14, 2011. *Id.* at 126. Via an email written by his attorney on February 18, 2011, Heritage indicated he was willing to negotiate with MedImpact, *id.* at 135, but,

according to the plaintiffs, MedImpact failed to respond, doc. 129-71 *SEALED* at

67–68.

The contract between PEEHIP and MedImpact contains the following

provision:

> Direct Member Reimbursement ("DMR"). MedImpact or Client shall provide an Eligible Member with a MedImpact (and Client approved) claim form for use for submitting non-electronic Claims for reimbursement for Covered Benefits provided by a Participating or non-Participating Pharmacy. When such a Claim is submitted on the approved form, MedImpact shall process the Claim according to the Eligible Member's Benefit Plan and in the amount agreed to by the Client for payment, and payment will be made to the Eligible Member by MedImpact as required by applicable Law.

Doc. 129-6 *SEALED* at 13. After PEEHIP removed APNS from its network,

Heritage encouraged his customers to pay full price for their prescription medication

and then seek reimbursement from MedImpact via DMR. Doc. 129-65 *SEALED*

at 20–21. Although it appears that MedImpact briefly reimbursed the plaintiffs'

patients who submitted DMR requests, it soon began refusing to do so.[3] *Id.* at 22, 44,

64. Additionally, MedImpact sent letters to the plaintiffs' patients who sought

reimbursement via DMR explaining that "the PEEHIP prescription drug plan has

always had an exclusion to disallow drug coverage if members use a non-

participating pharmacy in the state of Alabama even if they file a paper claim," and

---

[3] In a January 26, 2011 letter, PEEHIP counsel explained to the plaintiffs' counsel that the DMR provision of the PEEHIP–MedImpact contract "states that 'MedImpact shall process the Claim *according to the Eligible Member's Benefit Plan*," and that "[t]he PEEHIP Hospital/Medical plan document . . . states that '[i]n Alabama, benefits are only for prescriptions purchased from Participating Pharmacies.'" Doc. 129-68 at 111 (emphasis in the original).

that "the PEEHIP plan will no longer be able to reimburse you for future prescriptions filled at non-participating Alabama pharmacies." Doc. 129-6 at 117. The letter also contained instructions for locating nearby participating pharmacies. *Id.*

On June 8, 2011, after the plaintiffs initiated this lawsuit[4], APNS reached an agreement with MedImpact. Doc. 152-6 *SEALED* at 98. The plaintiff pharmacies, who were still members of APNS, received the opportunity to participate under the APNS–MedImpact contract, but declined and withdrew from APNS on June 9, 2011. Doc. 152-4 *SEALED* at 67–68; *id.* at 136–37.

## III. ANALYSIS

The plaintiffs allege claims pursuant to the RICO act and Alabama law for antitrust violations, negligence, wantonness, unjust enrichment, and intentional interference with a business relationship. The defendants contend they are due summary judgment on all of the plaintiffs' claims. The court will examine each claim in turn.

### A. The plaintiffs' RICO claim

In Count Five, the plaintiffs allege that the defendants engaged in a pattern of racketeering activity in furtherance of a "scheme to create a closed and[/]or limited access network of pharmacies in contravention of Alabama Law, in restraint of trade,

---

[4] On May 24, 2011, the plaintiffs filed suit in the Circuit Court of Madison County, Alabama. Doc. 1 at 1. The defendants subsequently removed the matter to this court on June 23, 2011. *Id.*

and in an effort to control the provision of pharmaceutical services and prescription medications to [PEEHIP] beneficiaries," in violation of the RICO Act. Doc. 1-1 at 8, 11–12.

> [T]o state a prima facie civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must establish three essential elements: first, that the defendant committed a pattern of RICO predicate acts under 18 U.S.C. § 1962; second, that the plaintiff suffered injury to business or property; and, finally, that the defendant's racketeering activity proximately caused the injury.

*Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014) (citing *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 265–68 (1992); *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991)).   The defendants argue that they are due summary judgment on the RICO claim because the plaintiffs have failed to present sufficient evidence of causation. Doc. 115 at 40. As a preliminary matter, except for broad assertions regarding causation in the opposition brief, the court notes that the plaintiffs have failed to cite a single piece of evidence to rebut the defendants' argument concerning causation.[5] Doc. 123 at 44. This failure is fatal to their claim because:

> the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a

---

[5] The court cannot consider the contentions in the brief because "statements by counsel in briefs are not evidence." *Skyline Corp. v. Nat'l Labor Relations Bd.*, 613 F.2d 1328, 1337 (5th Cir. 1980).

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex*, 477 U.S. at 322–23. Consequently, the defendants are entitled to summary judgment for this reason alone.[6]

Even were the court to consider the plaintiffs' unsupported arguments concerning causation, summary judgment would still be due on the RICO claims. "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

The Supreme Court's seminal case regarding RICO's causation requirements is *Holmes v. Securities Investor Protection Corp.* In *Holmes*, the plaintiff, a non-

---

[6] Were the plaintiffs to argue that support for their RICO claim is buried in the 6,500-plus pages of documents they filed in support of their opposition to the defendants' motion for summary judgment, the court's decision would remain unchanged. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990)). "Rather, the onus is upon the parties to formulate arguments." *Id.* (citing *Rd Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).

profit entity that functions as an insurer designed to protect the customers of its member broker-dealers in the event of a member's financial failure, filed a RICO action against the defendant, alleging that the defendant "conspired in a stock-manipulation scheme that disabled two broker-dealers from meeting obligations to customers, thus triggering [the plaintiff's] statutory duty to advance funds to reimburse the customers." 503 U.S. at 261. While the Court acknowledged that the language of 18 U.S.C. § 1964 "can, of course, be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a "but for" cause of plaintiff's injury," *id.* at 265–66, the Court noted that the statutory and legislative history supported the premise that the plaintiff must establish proximate causation as well. *Id.* at 267–68. Consequently, to succeed on a RICO claim, a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268.

Turning to the facts before it, the *Holmes* Court rejected the plaintiff's RICO claim because the plaintiff failed to prove that the defendant proximately caused its injury. Even allowing the plaintiff to stand in the shoes of the broker-dealers' customers, the Court reasoned that

> the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers

> only insofar as the stock manipulation first injured the broker-dealers and left
> them without the wherewithal to pay customers' claims.

*Id.* at 271. The Court further explained that the facts of *Holmes* illustrated one of the

rationales for a strict causation requirement in the RICO context:

> If the . . . customers were allowed to sue, the district court would first need to
> determine the extent to which their inability to collect from the broker-dealers
> was the result of the alleged conspiracy to manipulate, as opposed to, say, the
> broker-dealers' poor business practices or their failures to anticipate
> developments in the financial markets.

*Id.* at 272–73.

Subsequent Supreme Court cases have reinforced the Court's holding in

*Holmes*. In *Anza v. Ideal Steel Supply Corp.*, the parties operated competing stores

that sold steel products. 547 U.S. at 453–54. The plaintiff contended that the

defendants "adopted a practice of failing to charge the requisite New York sales tax

to cash-paying customers, even when conducting transactions that were not exempt

from sales tax under state law. This practice allowed [the defendants] to reduce [their]

prices without affecting [their] profit margin" *id.* at 454, thereby gaining a

competitive edge over the plaintiff, *id.* at 455.  The plaintiff further contended that the

defendants "submitted fraudulent tax returns to the New York State Department of

Taxation and Finance in an effort to conceal their conduct." *Id.* As in *Holmes*, the

*Anza* Court found that proximate cause was lacking. *Id.* at 458. The Court noted that

the alleged predicate RICO violations were wire and mail fraud, which the defendants

purportedly committed by filing fraudulent tax returns with the State of New York,

and that, as such, "[t]he direct victim of this conduct was the State of New York, not"

the plaintiffs. *Id.* As in *Holmes*, the facts of *Anza* illustrate how the Court's direct

causation requirement spares courts the difficulty of "ascertain[ing] damages caused

by some remote action." *Id.* As the Court put it,

> The injury [the plaintiff] alleges is its own loss of sales resulting from [the defendants'] decreased prices for cash-paying customers. [The defendants], however, could have lowered [their] prices for any number of reasons unconnected to the asserted pattern of fraud. [They] may have received a cash inflow from some other source or concluded that the additional sales would justify a smaller profit margin. [Their] lowering of prices in no sense required it to defraud the state tax authority. Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts.

*Id.* at 458–59.

Similarly, in *Hemi Group, LLC v. City of New York, N.Y.*, in which the City of

New York pursued a RICO action against an out-of-state cigarette vendor, the Court

once again found the plaintiffs failed to establish proximate cause. 559 U.S. at 5, 12.

The City imposes a $1.50 per pack tax on cigarettes. *Id.* at 5. The City is responsible

for recovering that tax directly from customers who purchase cigarettes from out-of-

state vendors, such as the defendant. *Id.* The Jenkins Act "requires out-of-state

cigarette sellers to register and file a report with state tobacco tax administrators

listing the name, address, and quantity of cigarettes purchased by state residents." *Id.*

State officials then provide that information to the City. *Id.* The City contended that

the defendants' failure to file Jenkins Act information with the state cost the City

millions of dollars in tax revenue per year. *Id*. The Court, however, found that the City's theory of causation was too attenuated to constitute proximate cause. *Id*. at 11. Noting that "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes[, a]nd the conduct constituting the alleged fraud was [the defendant's] failure to file Jenkins Act reports," the Court refused to "stretch[] the causal chain of a RICO violation" to encompass a "situation[] where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to harm the plaintiff (the City)." *Id.* at 11.

Here, the parties are in agreement that the loss of PEEHIP customers was the harm suffered by the plaintiffs. Doc. 115 at 39; doc. 123 at 44. Not surprisingly, that is where their agreement ends. The defendants contend that Heritage's refusal to contract with MedImpact caused the loss of PEEHIP customers. Doc. 115 at 41. The defendants are correct that under their theory, causation is lacking because Heritage, not MedImpact, directly caused the loss of the plaintiffs' PEEHIP customers.[7] The plaintiffs, however, seem to contend that three distinct actions caused the loss of their PEEHIP customers[8]: 1) the December 7, 2010 PEEHIP Board vote to remove APNS

_____

[7] Additionally, rejecting a contract is not a predicate act as defined by 18 U.S.C. § 1961(1).

[8] In their complaint, the plaintiffs identified the predicate acts giving rise to their RICO claim as "mail fraud, wire fraud, interference with the operation of employee benefit plans, and/or extortion." Doc. 1-1 at 11. The court is not convinced that any of the supposed predicate acts described by the plaintiffs constitute mail fraud, wire fraud, or extortion. Additionally, the court can find no authority supporting the notion that interference with the operation of an

from its retail pharmacy network[9]; 2) MedImpact's December 2010 mailing to APNS customers directing them to in-network pharmacies; and 3) MedImpact's refusal to reimburse plaintiffs' patients who submitted DMR requests and mailing informing those customers that MedImpact would not reimburse them for prescriptions filled at non-participating pharmacies. Doc. 123 at 44. As a preliminary matter, this third purported predicate act cannot support the plaintiffs' RICO claim because the people who were directly harmed by MedImpact's refusal to honor DMR requests were the plaintiffs' patients, who had paid full price for their prescriptions and were left holding the bag, as it were. *See Anza*, 547 U.S. at 458–59 (rejecting a similar scenario). More to the point, after considering the parties' arguments as a whole, it is clear that it is impossible to isolate an individual act as the direct cause of the loss of the plaintiffs' PEEHIP customers. Rather, a number of events and decisions culminated in the loss of these customers. At least two of these decisions—Heritage's rejection of the December 28, 2010 contract terms extended by MedImpact and his June 2011 refusal to participate in the APNS–MedImpact contract and the plaintiffs' subsequent withdrawal from APNS—were made by Heritage. Finding the existence

---

employee benefit plan is a predicate act as defined by 18 U.S.C. § 1961(1); *c.f.* 18 U.S.C. § 1961 (listing *embezzlement* from an employee benefit plan as defined by 18 U.S.C. § 664 as a predicate act for RICO purposes).

[9] In spite of the plaintiffs' attempts to insinuate that MedImpact executives tricked the PEEHIP board into voting to remove APNS from PEEHIP's network, doc. 123 at 21-22, 44, the board's vote cannot be the requisite predicate act for the plaintiffs' RICO claim because it was committed by the PEEHIP board, not the defendants.

of proximate cause under these circumstances would require the court to string together a series of events similar to the approach rejected by the *Hemi* Court, apportion responsibility in the manner considered and rejected by the *Holmes* Court, and to ignore Heritage's role in losing his pharmacies' PEEHIP customers, a deviation from RICO jurisprudence that this court is unwilling to make.

In sum, because the plaintiffs failed to present the court with any evidence supporting their RICO claim, or, in the alternative, because the plaintiffs' theory regarding proximate cause fails as a matter of law, the defendants' motion for summary judgment as to the RICO claim is due to be granted.

### B. The plaintiffs' antitrust claims

In Count Six, the plaintiffs contend that the "defendants created, devised, and implemented a plan and/or scheme to limit the provision of pharmaceutical services and prescription medications within the State of Alabama," in violation of Alabama's antitrust laws, Ala. Code. §§ 6-5-60 and 8-10-1, *et seq*. Doc. 1-1 at 15. While the plaintiffs' claim is based on Alabama law, "[u]nder Alabama law, federal antitrust law 'prescribe[s] the terms of unlawful monopolies and restraints of trade as they should . . . be administered in Alabama.'" *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 555 (11th Cir. 1998) (citing *Ex parte Rice*, 67 So. 2d 825, 829 (Ala. 1953)). Consequently, the plaintiffs' antitrust claims are governed by federal law.

The plaintiffs claim that the defendants violated Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2. Doc. 123 at 45–47. To establish a claim under either section, a plaintiff must produce evidence of harm to competition. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004) ("As with Section One claims, conduct that injures individual firms rather than competition in the market as a whole does not violate Section Two."). The defendants contend the plaintiffs have failed to meet this burden. Moreover, the defendants present the court with the following excerpt from Heritage's deposition, in which he appears to admit that competition between Madison County pharmacies has increased since MedImpact began administering PEEHIP:

> Q: So do you have more competition now than you had in 2010 or less competition?
> A: If you consider the whole Madison County area, we would—I would say yes, but not any that's within close proximity to any of my stores, no.
> Q: But in Madison County as a whole, there is more competition now?
> A: There is in Madison County as a whole, yes.

Doc. 152-6 *SEALED* at 16–17.

In response, the plaintiffs fail to cite a single piece of evidence accounting for Heritage's statement or indicating that the defendants harmed competition between pharmacies in Alabama. *See* doc. 123 at 45–47. The plaintiffs wanly attempt to gloss over this deficit by stating that "[a]t the pleading stage, a plaintiff may satisfy the unreasonable-restraint [of competition] element by alleging that the conspiracy produced anticompetitive effects in the relevant markets," *id.* at 47 (quoting *W. Penn*

*Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010)), and citing to a case where this court purportedly "held a similar scenario satisfied the consumer-injury requirement and survived a motion to dismiss," *id.* (citing *N. Jackson Pharmacy, Inc. v. Express Scripts, Inc.*, 345 F. Supp. 2d 1279, 1291–92 (N.D. Ala. 2004)). The plaintiffs are well aware that, after three years of litigation (including a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which the plaintiffs largely survived, *see* doc. 12), this matter is well past the pleading stage and, unlike at the pleading stage, where "a judge ruling on a defendant's motion to dismiss a complaint 'must accept as true all of the factual allegations contained in the complaint,'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n. 1 (2002)), at the summary judgment stage, once the moving party has proved the absence of a genuine issue of material fact, *Celotex* 477 U.S. at 323, the burden then shifts to the nonmoving party, who is required to "*go beyond the pleadings*" to establish that there is a "genuine issue for trial," *id.* at 324 (emphasis added) (citation and internal quotation marks omitted). Because the plaintiffs have failed to make the requisite showing of harm to competition, the defendants' motion for summary judgment is due to be granted.

Perhaps because the plaintiffs recognize that they cannot simply rely on their pleadings at this stage, the plaintiffs contend also, albeit without providing any legal authority for their position, that "[s]ummary judgment is improper before expert

analysis, especially when obvious marketplace harms are associated with "[the d]efendants' acts," doc. 123 at 47, and that "expert opinion will provide additional evidence on the issue," *id.* Duly, after the expiration of the deadline for the plaintiffs to file their response to the defendants' motion for summary judgment, and without moving for an extension of time or leave to file a surreply, the plaintiffs filed two supplemental submissions in opposition to the motion for summary judgment. *See* doc. 117 (briefing schedule establishing March 12, 2014 deadline for the plaintiffs to respond); *c.f.* docs. 128-1 and 128-2 (plaintiffs' supplemental submissions, filed March 31, 2014). The court is somewhat at a loss to discern the plaintiffs' intentions regarding these additional submission, as the plaintiffs indicate that the submissions "address issues unraised by [the d]efendants and unnecessary to [the d]efendants' summary judgment motion." Doc. 131 at 3. Moreover, the defendants seek to strike the submissions as procedurally improper. Doc. 130. The court acknowledges the defendants' arguments, but, in the interest of thoroughness, has reviewed the submissions for any evidence pertaining to the grounds on which the court is granting the defendants' motion for summary judgment on the antitrust claim, namely, that the plaintiffs have failed to present any evidence that the defendants harmed competition between pharmacies in Alabama. The court concludes that the submissions contain no such evidence.

The plaintiffs' supplemental submissions are two expert reports, one prepared by Christopher Mercer and Mercer Capital addressing the damages sustained by the plaintiffs, doc. 128-1, and one prepared by John Simpson and the Brattle Group addressing the elements and issues of the plaintiffs' antitrust claims, doc. 128-2. As the Mercer report addresses the damages sustained by the plaintiffs, as opposed to Madison County or Alabama pharmacies generally, it is irrelevant to the issue of whether the defendants harmed competition between pharmacies. The only information in the Simpson report that can be construed as bearing on harm to competition is the following[10]:

> MedImpact's use of selective contracting reduced the compensation that pharmacies obtain for filling prescriptions for PEEHIP members. As described above, it is this compensation that provides the incentive for pharmacies to compete on quality dimension such as the length of store hours, the provision of home delivery, counseling and training, and the helpfulness of pharmacy staff. Thus, in expectation, MedImpact's lowering of compensation of pharmacy would lead to reduced provision of these services.

Doc. 128 at 26. The Simpson report contains no citations indicating the basis of this opinion. "While an expert may base an opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible in evidence, '[t]heoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert . . . are [not] entitled to any weight when raised in opposition

---

[10] Although the Simpson report contains an additional heading reading "MedImpact's Behavior Reduced Competition and Harmed Consumers," doc. 128 at 20, the ensuing information only discusses harm to consumers, *id.* at 20–25.

to a motion for summary judgment.'" *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d 1267, 1283 (M.D. Ala. 1998) (quoting *E.T. Barwick Indus. v. Walter Heller & Co.*, 692 F. Supp. 1331, 1347 (N.D. Ga.1987), *aff'd*, 891 F.2d 906 (11th Cir.1989)). It is well established that "a party may not avoid summary judgment on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 985 (11th Cir. 1985). "Conclusory allegations without specific supporting facts have no probative value." *Id.* at 986; *see also United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir.1988) ("[C]ertainly where an expert's testimony amounts to no more than a mere guess or speculation, a court should exclude his testimony."). Because the Simpson report fails to meet this circuit's standards for expert testimony at the summary judgment stage, the court will not consider it when determining whether the motion for summary judgment on the antitrust claim is due to be granted. Therefore, the defendants' motion to strike the Mercer and Simpson reports, doc. 130, is moot.

In sum, the plaintiffs have failed to present any evidence indicating that the defendants harmed competition among pharmacies within the state of Alabama. Consequently, the defendants' motion for summary judgment as to the plaintiffs' antitrust claim is due to be granted.

*C. The plaintiffs' unjust enrichment claim*

Although their complaint states a claim of unjust enrichment in Count Three, doc. 1-1 at 6–7, the plaintiffs failed to address the defendants' arguments concerning those claims in their response to the motion for summary judgment. Consequently, the plaintiffs have abandoned their unjust enrichment claim and the defendants are entitled to summary judgment on it. *See e.g.*, *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n. 2 (11th Cir. 2009) (finding that the plaintiff waived claims he did not address in his response to the defendant's motion for summary judgment) (citing *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n. 1 (11th Cir. 2001)). Alternatively, summary judgment is also due because the plaintiffs failed to present evidence that the defendants possess money that rightfully belongs to the plaintiffs. *See Hanock-Hazlett Gen. Constr. Co., Inc. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (rejecting the plaintiff's unjust enrichment claim "as a matter of law" because the defendant "does not have in its possession any money belonging to [the plaintiff]").

*D. The plaintiffs' remaining claims*

"If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). This matter was properly removed from state court based on this court's jurisdiction over the RICO claims pursuant to 28 U.S.C. 1331. Doc. 1 at 2. However, now that the

court has granted the motion for summary judgment on that claim, the plaintiffs' remaining claims—negligence, wantonness, and intentional interference with a business relationship—solely raise questions of Alabama law. While the court may have authority to exercise supplemental jurisdiction over these remaining state law claims, it nevertheless may decline to exercise supplemental jurisdiction where, as here, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Arnold v. Tuskegee Univ.*, 212 F. App'x. 803, 811 (11th Cir. 2006) ("When the district court has dismissed all federal claims from a case, there is a strong argument for declining to exercise supplemental jurisdiction over the remaining state law claims."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (stating that the Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial"). Considering that the plaintiffs' remaining claims relate solely to issues of Alabama statutory and common law and ultimately will require a resolution of whether the claims are premised on contract law—as the plaintiffs contend—or on the two statutes, neither of which provides a private cause of action, *see* doc. 12 at

6–9[11], comity points in favor of declining supplemental jurisdiction. Accordingly, judicial economy, convenience, fairness, and certainly comity is best served by remanding these claims back to the Circuit Court of Madison County, Alabama, *see Birster v. Am. Home Mortg. Servicing, Inc.*, 796 F. Supp. 2d 1376, 1380 (S.D. Fla. 2011) (*rev'd on other grounds by* 481 F. App'x 579 (11th Cir. 2012)) (remanding state law claims to state court after granting defendant's motion for summary judgment on plaintiff's sole federal claim), for the court to decide, among other things, whether the plaintiffs' common law claims are not dependent on a private right of action conferred by Ala. Code §§ 27-45-3 and 34-23-115 and, if necessary, the merits of the plaintiffs' remaining state law claims.

## IV. CONCLUSION

In sum, because the plaintiffs have failed to meet their evidentiary burden, the defendants' motion for summary judgment on the plaintiffs' RICO, antitrust, and

---

[11] The court's decision to remand the plaintiffs' remaining claims is also influenced by the fact that the claims not only relate solely to state law, they also raise unanswered questions of state law. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997) (noting that a "federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court"). Particularly, the resolution of the plaintiffs' negligence and wantonness claims requires determinations regarding the meaning of and interplay between Alabama's Any Willing Provider statute, Ala. Code § 27-45-3, and its Usual and Customary statute, Ala. Code § 34-23-115. Although the statutes have been in effect for more than two decades, Alabama's courts have afforded them little attention. Moreover, as referenced above, while this court, when considering the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), found that the "[p]laintiffs have pled sufficient facts *at this juncture* to establish that their common law claims are not dependent on a private right of action conferred by" Ala. Code §§ 27-45-3 and 34-23-115, doc. 12 at 9 (emphasis added), principles of comity, when viewed alongside the other factors advocating remand of this matter, counsel in favor of an Alabama court determining whether that remains the case.

unjust enrichment claims are due to be granted. The plaintiffs' remaining negligence, wantonness, and intentional interference with a business relationship claims are remanded to the Circuit Court of Madison County, Alabama. The court will enter a separate order consistent with this memorandum opinion.

**DONE** this 10th day of September, 2014.


_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE